Case number 23-5214, Roy Stucker et al. v. Louisville Metro Government et al. Argument not to exceed 15 minutes per side. Mr. Rose, you may proceed for the appellants. Good morning. I'm Josh Rose. I represent the appellants and the plaintiffs below. Roy Stucker, Courtney Brown Porter, on behalf of herself and her daughter, a minor. May I reserve five minutes for rebuttal? Thank you. This case is here because my clients were painters in the summer of 2019. They were hired by a property owner who leased a house to different tenants. Old Towns vacated. The property owner hired my clients, Roy Stucker and his longtime girlfriend, Courtney Brown Porter, to paint the house. They went into the house. The carpets had already been ripped out. The house was vacant. No furniture. And began painting. On the second day, put newspaper on the windows, had a painting truck out front. On the second day of painting, the Louisville Metro Police Department SWAT team of at least 10 members dressed in military gear descended on the home, both the front and the back, in RV vehicles. They surrounded the home, the windows and the doors. They busted through the windows. They busted through the doors after a quick knock. They knocked an ounce and busted in immediately. I don't know if your honors watched the videos or not, but I don't think there's any dispute about that. Ms. Porter and her daughter ran to the bathroom, jumped and hid in the bathtub because they didn't know what was going on. They thought they might be getting robbed or what have you. Eventually, all three of my clients exited the residence. They were handcuffed for 20-30 minutes while the police conducted the search. They eventually let go. Apparently the police finally realized this is a vacant house. Maybe the SWAT team thought we were at the wrong place. I guess they put the wrong address on the search warrant, but that's not what happened. You would hope that a mistake like that would just be a mistake, but that's not why this happened. This happened because of systemic failure with the Louisville Metro Police Department. Lack of training, supervision, investigation and discipline regarding search warrants not having probable cause. They just don't. The Department of Justice recently formed this opinion as well after an extensive investigation and came to that exact conclusion. The conclusion is that their training is not perhaps what it should be, but I don't think there's no training at all, right? Don't you need to show that there's basically no training? You have to show they're deliberately indifferent. If I have a city and I'm doing training, somebody comes in. There's a previous report. There's a DOJ report. They say, hey, your training is not adequate. You need to make some changes. But if anything, that shows that at least you're doing some training, but we're going to help you and you can do more training. But I'm not being deliberately indifferent, am I? I'm just kind of not doing enough. There are three grounds that these claims rest on. Lack of training is one, and there are two ways we can meet the lack of training. One is a complete lack of training, as you mentioned, under OOZA. And what OOZA said is the academy training doesn't count. When all police officers come into the academy, there's a very minimal training on search warrants. But there has to be more. So OOZA says there was no other training, it seemed to me. At least that's what the opinion implies in the record, that there's no other training going on. Here, there's other training going on. There's a dispute about whether this particular officer retained anything from it or what. But they are doing the training, right? The 32-hour course covers something having to do with search warrants, right? No, Your Honor. You're saying it doesn't cover search warrants at all? So the training, the only required training after the academy, there is no required training after the academy. It's elective training, kind of like CLEs. And the officers get to pick and choose what training they want to do. I don't think OOZA says anything like that, right? OOZA says there was no training. There was literally no training. Here, there's training. I don't know if it's required. I don't know what's going on. But that seems to me to be a different argument, right? We would have to have a different case for that, right? I don't believe so. I believe OOZA is on point. The training is not mandated, the search warrant training. The 40-hour week-long course is not mandated. And only 6% of LMPD officers took the training. Detective Troutman was one of them. He was one of the most prevalent search warrant obtainers in LMPD. His sergeant called him the Batman of the unit. He admitted in deposition he had gone to get over 200 search warrants. For somebody like that to not be required to take the extensive search warrant training is unfathomable to me and I think fits squarely within OOZA and the case law that that's a lack of training. That's a complete and utter lack of training. If somebody like Detective Troutman doesn't have to take it and only 6% of your officers actually do elect to take it, that's a lack of training in full. And then there's also a complete custom and tolerance of constitutional violations because the policies on search warrant probable cause don't match up with the training. When I took Detective Troutman's deposition, he didn't know who he was supposed to have review his search warrant affidavits. It's in the policy. It's in the training. He doesn't know, even though he's one of the most extensive search warrant obtainers at LMPD, he doesn't know who he's supposed to have review it. Right, so it seems to me you'd have a great case against him. But I don't, I'm still struggling with, I mean, it's, if he's not complying with their policy or doing other things that he needs to do, I don't know, I mean, maybe he could be disciplined. I don't know whatever it is. But I mean, yeah, maybe he's a great defendant, but I'm not sure the city is on the hook for all of this. None of the, as the Hilliard-Hines report, the DOJ conclusion, none of the officers know what the requirements are because they're not trained. And so if Detective Troutman doesn't know, nobody knows. And he's one of the most extensive officers there. And the standard is different against officers. You have to show malice, misrepresentation, bad faith in the affidavit. That's a completely different case than we do. We did bring a claim, as you know, against Detective Troutman as well. And that's a separate issue if you have questions on that in just a little bit. But the affidavit was concealed. His identity was unknown. And so he was dismissed on statute of limitations grounds. And we have a concealment argument that he should not have been dismissed because we think there was bad faith and misrepresentation. So there's a separate claim against him. But what about your ability to get it through the court? Weren't you informed of how you had to go to the clerk and make the request? And when you did that, you got it immediately, right? No, Your Honor. First there was a Freedom of Information Act request. Yes. That was refused by Louisville Metro. I understand that. You're talking about when the method of having it released was actually addressed. When you followed the information that had been provided, then you got it immediately at that time, right? It just happened that that was after the statute ran. Yes. Within a few weeks, you had to file paperwork with the court. You had to go in front of the judge and ask her to unseal the affidavit. And that worked. That did work. What was before this court was the Heinz report, right? So all of these issues are on the record, and that's the dispute. But the court never was—the DOJ report came out a little bit too late for that. So that was never part of the court's examination. Is that correct? That is correct, Your Honor. The DOJ report came out after the lower court ruled. But there's no claim by the police department that it couldn't have been aware of the DOJ report, right? It was the one being investigated. It was absolutely aware of the investigation, and probably—I don't know if there are preliminary reports. We didn't get to do discovery on any of that. The DOJ report covers the years 2016 to 2021, reviewed hundreds, if not thousands, of search warrant affidavits. And this raid occurred in July of 2019 about smack dab in the middle of that investigation, of the period of that investigation. So that was—I mean, it seemed like the court didn't consider much at all because they ruled against my clients simply on the probable cause, which is step number one. Does the search warrant have probable cause? They didn't—you know, the court then found, well, there's no municipal liability, et cetera. But, I mean, there is absolutely no way the search warrant had probable cause for this residence. Your light is on. You'll have five minutes of rebuttal. Will you come back and address that issue and what remedy it is you seek on that basis? Sure. Thank you. Good morning, Your Honors. My name is John Carroll. I represent Officer Wesley Troutman as well as the Louisville-Jefferson County Metro government. This is a case in which the district court chief judge got it right. He had two different orders here, and in each instance he got it right. Did you all engage in settlement discussions? I'm just curious. I'm sorry, Your Honor. Did you all engage in settlement discussions below? I'm just curious. Judge, we did not go to a mediation. I filed almost immediately in this case a motion to dismiss for lack of failure to abide by the statute of limitations, and the claims against Officer Troutman were dismissed based upon that 12B6 motion. We then engaged in discovery in this case, significant discovery in which 230B6 depositions were taken. Officer Troutman's deposition was taken. His commanding officer, who is head of this unit, Sergeant Neal, was taken as a deposition. The facts do not warrant in terms of engaging in settlement negotiations. This case happened. This search happened on July 15th of 2019. The DOJ report came out in March of 2023. That's a long time. But the DOJ investigation covered that time period, didn't it? Judge, what we have in the actual DOJ report, if you actually take a look at the DOJ report, the part that has to do with search warrants, it doesn't say anything about Officer Troutman or his search. It doesn't almost say virtually anything about the facts of this case whatsoever. I think, counsel, that may not be the issue in a Monell claim. The question is, was there a constitutional violation? There is no constitutional violation. And was there activity on the Monell claim available against this entity? So you do have the two parts of that. You have to show that there was a policy that was used that was not appropriate. So the question, I think, before us on this case, is even if Troutman has been dismissed, which he was on the statutory time frame, the question is the Monell claim that remains. So what is your argument to why, in the context of all the facts of this case, there was probable cause appropriate in this warrant? And again, I think to start with that, you have to take a look at Judge Stiver's opinion, which is a 25-page opinion in which he goes through the arguments. He goes through everything. He goes through staleness for five pages. In fact, this is a two-month-plus drug investigation in which there were multiple buys made, controlled buys, over the course of over two months from early May to end of July. How many were connected to this home? I'm sorry? How many times was this Kirk, who was the drug dealer, connected to this home? This Kirk fellow is probably, I think there are six buys identified by Judge Stiver's. There's at least five times that he mentions in the affidavit for surveillance. Counsel, I'm asking you about this house because in order to have a valid warrant for a home, you have to show that that home is likely to have evidence. Twice, Your Honor. Two different buys. One during the week of, I believe it's June 7th, and another one is June 25th, the week of June 25th. But again, one of the factors that Judge Stiver's looked at is the fact that this is not a one-day, one-instance drug investigation. This is a major dealer who, in fact, during part of this time, he went up to Mount Gilead, Ohio, and they surveilled him in respect to that. I don't see the relevance of that. I mean, we just heard a case on Bonk last week. We're considering this issue. You have to connect. There has to be a nexus between the residence and the drug activity, and it seems like in this case there might be two, but it seems pretty tenuous to me. One of them, I'm not even sure he goes into the house, does he? And I'm not sure there's full observation of him leaving the house, selling the drugs, and going back into the house. And the house had been searched before. It just seems really strange to me. I mean, this seems tenuous to me. The only thing I can tell you in that regard is, again, I don't think it's tenuous, and again, I think there has to be the judge in this case, and certainly the trial court judge in the state court issued the search warrant. And then when the search goes down, when the search is actually executed, Mr. Troutman is not there. Officer Troutman is at a different location, actually arresting Joshua Kirk for a pound of methamphetamine. And I do think that if you look at the search warrant. I don't understand how that cuts in your favor. He was arrested someplace else, not at this residence. The place that's being searched, the place that was searched before, where they found nothing. Well, I think it does, because again, Judge, one of the things is the officers who actually executed this search warrant that go there and execute this particular search warrant are not the ones who wrote the affidavit. But in addition to that, I do think, if you look at it, it's a long affidavit. It's written, it's several pages long in the affidavit, and it goes through step by step what happened, and it's very clear as to what happened, and the judge knew that when she issued the search warrant. And again, one of the things that... My concern is I understand that you're talking about, and I think the judge in this case even concedes this, that it is a regenerating conspiracy. But it is a conspiracy that has a large number of locations. There's three locations, yes. And in order to search this one, you have to show that this is the place where those drugs are likely to be. That he was arrested with those drugs somewhere else in another location does not help with the warrant on this house. So the question that you ask is, was this, was Kirk entrenched in this Amherst home, or was he nomadic? Under the law, he was clearly nomadic. He was arrested somewhere else. He was at all of these other sites, and that goes, that's in favor of staleness. Drugs themselves can be in favor of showing that a warrant is stale, because they're sold and gone. And the judge below conceded both of those. It seems to me that the real issue here is on the fourth staleness issue, the place to be searched. What is it that ties him to this place? And as Judge Nalbandian mentioned, there are only two times, and one of them he apparently didn't even go in. But the question, the real issue here is that 10 days before this, that place was searched. I don't believe it's 10 days, but yes, Your Honor, it's several days. I know that. It's certainly several days. And so it was searched by this police organization. So they know that it was searched. They know what came out of it was not the drugs that were accused in this. And then the people clear out of there. And it's completely vacant. And yet we go, a SWAT team comes and breaks into the house again with a painter. So you have to have shown that the execution of this warrant was appropriate at that time. Why doesn't the earlier empty search destroy probable cause? Because probable cause must be present when you get the warrant, and it must be present when you execute the warrant. So how is it present here? How is it present? Yeah, how is it present here? 10 days after a search that came up empty-handed on this issue. Again, Judge, the people actually continued to go to that residence. I mean, the evidence is certainly there in the record that people were continuing to go to that place in order to get drugs. Wait, you'll need to point that out to me, because the people It's not in the affidavit. I'm saying it's in the record, Judge. But in terms of the actual things that go on in this case, literally the day before this instance happened, they did a control buy. Now, yes, it's at a different location, but again, the last How do you just sort of shrug that off, that it's in a different location? Well, again, he's going to all these different places in terms of there's three different places that are involved in the warrant. That's true. It's a warrant. It's an affidavit that's written involving these three different locations, and that's the way it's written. And again, I think you have to give, number one, you have to give great deference to the judge involved. But you also, the other thing is, too, in the Allen case, I don't think you can, at this juncture, in the Allen case in 2000, the Sixth Circuit said you shouldn't, on review, necessarily sit there and try to pick apart one line and try to do that. Now, in this case, like I said, during the week of June 7th, there's a clear buy, and then on June 25th, it says that they observe him at the location, they observe him going in, they observe him going out, and there's information in that regard. Not that he went inside the house on the second time. There is not, I don't see anything in the record. No, it doesn't say exactly that he, it's right. It's at the location, and they say they see him going into their place and coming out, essentially. So, no, they don't go in on that occasion, and they can't necessarily say that. But, again, this is a person who obviously moves... Is that after they had searched the house before? No, before. No, it's before. What was the information that they gleaned after they searched and found nothing that would have led them to believe they could go back to the same place and search it again? Again, I can't tell you that there's anything in the affidavit. It's the same ongoing... It's the same ongoing, you know, they detail multiple buys. So they had probable cause to just keep searching the same place as many times as they wanted? That's an entirely different individual. This is essentially, from the proof in this case, this is a stash house, essentially, or a drug house in which multiple people go in and out of it. That's what it was, and it's over a period of time, and I think certainly consistent with case law that's not only in the Sixth Circuit but in almost every circuit. When you have an instance in which it's a long-standing drug investigation, I don't think probable cause is dissipated. I can agree with you that probable cause can be refreshed, but here it was not refreshed. The claim that Mr. Kirk is over in the hinterland selling drugs again cannot refresh probable cause for the Amherst house that's in a completely different location. That doesn't work. He refreshes the probable cause for where he is. What happened here was you had the search. People were moved out of the house. Kirk was not there. The drugs that Kirk was supposed to be selling were not there. So the question is where is the probable cause for Amherst because that's where it has to be. A warrant that covers three places doesn't mean that if probable cause goes away, you don't have to refresh it or get a new warrant for that particular location. You don't make that claim, do you? That because he's an ongoing drug dealer, we can search wherever he has been? No, Judge, I have not made that claim. But I do make the claim that it can be refreshed, and I do make the claim that in this particular instance, because it is a long-standing thing, what we have at most is connection to this property on the week of June 25th and we have a search on July the 15th. That's the period in time. And again, Judge, I think based on the fact that this is a long-standing, multiple-player conspiracy, I don't think it dissipates. I do not think that probable cause dissipates in this instance from this location. Can you address the training issue? Okay, I will. Is there any requirement that these officers go through any training? I assume you're saying there is some training, but this particular guy may or may not have done it. Are they not required to do it? Actually, there's two parts to that. This particular officer is somebody who wrote over 100 search warrants, who went to a DEA training course that was 80 hours, that had a substantial period of time to it to search warrants. He also went to another course during the time that he was a detective. Do you agree that he was kind of equivocal in his deposition about what kind of training he had received? And again, when you say equivocal, he indicated, Your Honor, that he couldn't remember exactly when he did certain things, but there are documents in the record to show when he attended and went to these courses. There's even a deposition from one of the people that taught at this course and testified that at the DEA course, in fact there are hours and a significant portion of the course is on search warrants. But the DEA course is not mandated for the officers at the LMPD, right? At that time, there was no mandated training for officers for search warrant training. Again... When did he take that course? When did he take that course? He took the DEA course, I believe it's 2016 or 17. He also went to another school in which there's some course working roughly a year or two before that that was through the Louisville Metropolitan Police Department. But neither of those courses were required by the Louisville Police Department? Not at that time, no. They had, and there's testimony also as well, that they, in their unit, because they were doing a large number of search warrants in Louisville, that they have interdepartmental training as well. There's a significant amount of that there and that's testified into in the 30B6 deposition. Okay, if there are no further questions, thank you. Regarding the locations, I think the panel's hit it on the head about the probable cause. He said three locations. There were tens of locations if you read the search warrant affidavit. They just got search warrants on three locations. Maybe they had probable cause for one or two, I didn't get into that. There certainly wasn't probable cause for the Amherst location. He only went there twice in two and a half months. I mean, there are probably hundreds of places, if not thousands, across the city of Louisville that he went to more than twice in two and a half months. The second time he went there, June 25th, he didn't even go in. How can you have probable cause to find drugs in a house that the suspect does not even go in on June 25th? On June 5th, the only other time he went there, further shows there's no probable cause to find drugs in the house because he went to the house, he got out of the car. It doesn't say he went in the house, but it says he exited the house a short time later. Doesn't say how long. He gets in another car. He leaves for an hour and 39 minutes. The officer puts in his affidavit, he returns a short time later to the house. No, it was an hour and 39 minutes. That means he got in a car with somebody. They probably went to get drugs somewhere. He comes back to the house to get in his car. He doesn't go back in the house. There wasn't even probable cause back in June 5th, much less July 15th, 40 days later. Now, the fact that Officer Trautman and the city of Metro still do not understand that there was not probable cause shows their culture and tolerance and deliberate indifference to the rights of citizens to be free from unreasonable search in CSER. I take Trautman's deposition. He's apparently at this time gone through the 40-hour search warrant training class that's unmandated. He's gone apparently through some DEA course that he doesn't know much about eight years earlier, and he still does not know that that's stale information and that there's no probable cause for this location. He tells me, I went to buy, the suspect went to sell drugs in Ohio, and he went here and he went there. That freshened up the probable cause. As your Honor aptly pointed out, no, it does not. It actually does the contrary. It shows he's getting drugs elsewhere. There's not one shred of evidence that shows there's probable cause for this house to be searched, and the result was a little girl had it down in the bathroom. If he's incompetent or didn't retain anything from his training, that's one thing, and again, you might have had a good suit against him. I'm still struggling with the deliberate indifference by the city here. I mean, yes, they're offering, so we all agree, they're offering training, training covers warrants, so then we're sitting here saying, well, I guess the argument is it's not mandated or not required. Is that what it's down to? I mean, is there a case law that says, look, merely offering training but not requiring is an indicia of deliberate indifference by the city? So I think it's more than just not training. Yes, they didn't train. It's the culture and tolerance of the lack of training, the lack of supervision, the lack of investigation. When things go so wrong that painters get raided based on absolutely no probable cause, Metro says, I take the sergeant's deposition, and the sergeant says, I think Officer Troutman did a great job. I don't think it was stale. I think there was probable cause. I think we trained good. Okay, he didn't say Officer Troutman made a mistake. We train our officers correctly. Well, Judge Stivers agreed, right? I mean, the judge signed off on the warrant, too. Judge Stivers was just the lower court judge. So Judge Mary Shaw was the state court judge that signed the warrant. And if you read the DOJ report and the Hilliard-Hines report, the officers repeatedly go to the same judges. There are certain judges they pick time and time again because they know that they're not... And to be fair to the judge, I don't think you can fully blame the judge either because you've got a 10-page affidavit that's replete with fact after fact and location after location. It would be very confusing for a state court judge that's reviewing a lot of these to get it right every time. I think the onus has to be on the city. The city is the primary cause for this debacle. Officer Troutman is also an issue as well. So I would ask that the court... I mean, we have recognized causes of action. And it's not, oh, this bad thing happened, you need to explain it. You have to set forth why it's actionable. And Troutman is no longer a defendant. So really you have to show a pattern in practice. I don't think you're seriously alleging notice before this incident, are you? I think there's a question of fact on notice given the DOJ report and the Hilliard-Hines report, how many instances they knew about and when they knew about it. I think that's definitely a fact question. But as far as Troutman goes, I do believe we have a good concealment argument because concealment tolls the statute limitations. If the affidavit were sealed one day before the statute ran and it took three weeks or a couple of months to get it unsealed, I mean, I still think Troutman should be brought back in as well. But on the remedy seeking, I think this court should rule that there absolutely was not probable cause for the search warrant, number one. Rule that what? There absolutely was not probable cause for the search warrant. I don't think that issue should even be remanded. I think that's clear in the record. Two, there are definitely questions of fact on the Minnell claim. We thank you both for your writings and your arguments on a fairly complicated issue. It will be taken under advisement and an opinion will be issued in due course.